Julie COCKERTON, Appellee,

v.

MERCY HOSPITAL MEDICAL CENTER, Appellant.

No. 91–1316.

Court of Appeals of Iowa.

July 30, 1992.

Jack Hilmes of Duncan, Jones, Riley & Finley, P.C., Des Moines, for appellant.

Ben Doran and Kirke C. Quinn of Courter, Quinn, Doran & Anderson, Boone, for appellee.

Heard by OXBERGER, C.J., and DONIELSON and SACKETT, JJ.

DONIELSON, Judge.

Julie Cockerton, age twenty-six, was admitted to Mercy Hospital Medical Center on June 23, 1987, for the purpose of surgery to correct a problem of Julie's open bite. Her back teeth meshed, but her front teeth did not meet. The four and one-half hour surgery was performed by John A. Maletta, D.D.S. In surgery, Dr. Maletta moved

Julie's upper jaw up and her lower jaw forward. He indicated there were no complications encountered during the operation. Following surgery, Julie still had a naso-gastric tube in her nose which had been inserted prior to surgery. At that time, Dr. Maletta observed no deviation or deflection of Julie's nasal septum.

Julie was transferred to the hospital's ward at 4:50 p.m. that day. Dr. Maletta ordered postsurgical x-rays for her head and face to be taken the next day. The next morning, between 8:00 a.m. and 8:15 a.m., hospital employees took Julie from her room to the x-ray department by wheelchair. The nurse assessed her condition as slightly "oozy" and drowsy. Julie was wearing a urinary catheter. An I.V. and the naso-gastric tube were still in place. Julie's mother, who accompanied her to the x-ray room, described Julie's condition as "death warmed over." At the time, Julie was unaware of what was going on.

Teresa Alexander, the x-ray technician took charge of Julie in the x-ray room. It was her third day on the job. After Julie was taken inside the x-ray room, she was transferred from the wheelchair to a portable chair for the x-ray procedure known as an orthopantogram. On moving Julie, she complained of nausea and Alexander observed that her pupils were dilated. Alexander did not use the restraint straps to secure Julie to the chair when the x-rays were taken. At some point during the x-ray procedure, Julie had a fainting seizure. Alexander called for help. When Molly Hewitt, also employed at Mercy Hospital, entered the room, Alexander was holding Julie in an upright position. Julie appeared nonresponsive. Julie only remembers being stood up and having a lead jacket thrown across her back and shoulders. Alexander maintains Julie did not fall.

Julie left the x-ray room lying down on a gurney. At that time, her level of consciousness was poor. When she was brought back to the ward, the naso-gastric tube was removed. Dr. Maletta noticed a deflection of Julie's nose, but had difficulty assessing it because of the surgical procedure from the day before. Because she had fainted in the x-ray room, he requested an incident report from the radiology department. The following day, the deflection of Julie's nose was much more evident. Dr. Maletta consulted Dr. Ericson, a specialist, who attempted to correct the deformity of Julie's nose. Dr. Ericson observed that it would require a substantial injury to the nose to deflect it to that severity. When Julie was discharged from Mercy she had a cast over her nose. When the cast was removed, Julie's nose had a couple of "S's" in it and she had trouble breathing. On March 11, 1988, Julie underwent surgery on her nose to open up the nasal passage and correct the crookedness. She maintains that she has continued to have problems with her nose.

Julie instituted these proceedings against Mercy Hospital alleging the negligence of Mercy's nurses or x-ray technicians allowed her to fall during the orthopantogram and subsequently caused injury to her nose. The district court did not require expert testimony concerning the standard of care given by the x-ray technician. The jury concluded that Mercy was negligent in leaving Julie unattended or failing to restrain her in the x-ray area which proximately caused her to fall and to be injured. The jury rendered a total verdict of $48,370.

After the district court denied Mercy's motion for judgment notwithstanding the verdict and for a new trial, Mercy appealed.

Mercy contends the district court should have granted its motion for a directed verdict, and later the motion for judgment notwithstanding the verdict or for a new trial because the allegations brought against the x-ray technician required expert testimony which was lacking in this case. Mercy asserts that Julie's evidence was not sufficient to establish: 1) the applicable standard of care; 2) a casual nexus between Mercy's conduct and Julie's injury; and 3) the amount of damages awarded.

■ A court ruling on a motion for directed verdict must view the evidence in the light most favorable to the nonmoving party. *Beitz v. Horak*, 271 N.W.2d 755, 757 (Iowa 1978); Iowa R.App.P. 14(f)(2).

Movant is considered to have admitted the truth of all evidence offered by nonmovant and every favorable inference that may be deduced from it. *B & B Asphalt Co. v. T.S. McShane Co.*, 242 N.W.2d 279, 284 (Iowa 1976). To overrule the motion the court must find substantial evidence in support of each element of nonmovant's claim. *Beitz*, 271 N.W.2d at 757.

■ A judgment notwithstanding the verdict must stand or fall on the grounds stated in the motion for a directed verdict. *Konicek v. Loomis Bros., Inc.*, 457 N.W.2d 614, 617 (Iowa 1990). In determining whether the trial court should have granted a new trial, we review for an abuse of discretion. *Witte v. Vogt*, 443 N.W.2d 715, 716 (Iowa 1989). In ruling on motions for new trial, the court has broad but not unlimited discretion in determining whether the verdict effectuates substantial justice between the parties. Iowa R.App.P. 14(f)(3).

I. *Expert Testimony.* Mercy argues the district court erred in not requiring Julie to produce expert testimony regarding the standard of care and causation. By not producing such expert testimony, Mercy argues the district court erred in not granting its motion for a directed verdict.

■ Ordinarily, evidence of negligence in a medical malpractice action must be proven by expert testimony. *Grosjean v. Spencer*, 258 Iowa 685, 140 N.W.2d 139, 143 (1966) (citations omitted). However, the Iowa Supreme Court has recognized an exception to this general rule. "[W]here a physician's lack of care is so obvious as to be within the comprehension of laymen, and to require only common knowledge and experience to understand, expert testimony is unnecessary." *Buckroyd v. Bunten*, 237 N.W.2d 808, 811 (Iowa 1976). In *Kastler v. Iowa Methodist Hospital*, 193 N.W.2d 98 (Iowa 1971), the court held that when the conduct involves routine, non-medical care, the applicable rule is such reasonable care as the patient's known condition may require. *Id.* at 101. Expert testimony is not required to establish the standard of "reasonable care."

■ We find the facts in this case analogous to those in *Kastler.* In *Kastler,* the court applied the "reasonable care" standard when the plaintiff, who had fainted in a hospital shower, was injured. Here, Julie alleges that she was injured during a simple fall or trauma while in the x-ray room. The focus of Julie's case is upon the routine care that Mercy provided her in transporting her and in handling her person during the x-ray examination.

We reject Mercy's argument that the x-ray procedure cannot be categorized as routine or ministerial care. The conduct in question is simply the way the x-ray technician handled Julie during the x-ray examination. In arguing for a professional standard, Mercy Hospital points to the elaborate training requirements for an x-ray technician, as laid out by the Iowa Administrative Code. However, the fact that an x-ray technician must meet certain requirements under the Iowa Administrative Code does not make all of her conduct professional in nature.

In sum, this was not the kind of case requiring expert testimony to establish a deviation from an accepted standard of care of hospitals. Rather, the case involves a situation where the hospital was required to exercise ordinary care in providing a routine service in light of the patient's known condition.

II. *Breach of Standard of Care.* Mercy's next contention is that evidence presented by Julie at trial was insufficient to establish that a breach of care was committed by Mercy. Mercy argues that the district court erred in not granting its motion for a directed verdict.

As we have rejected Mercy's argument that expert testimony was necessary, the applicable standard is that of "reasonable care." The adoption of the reasonable care rule means that the plaintiff is not required to present proof of the general practice of hospitals respecting the conduct in question. As expert testimony is unnecessary, the jury may use its own knowledge and good sense with respect to the hospital's conduct in question. *Kastler v. Iowa Methodist Hosp.*, 193 N.W.2d 98, 102 (Iowa

1971). In assessing "reasonable care," the standard is "such reasonable care for patients as their known mental and physical condition may require." *Id.*

■ The hospital charts indicated that Julie was feeling poorly on the morning of the x-ray. The x-ray technician testified that during the x-ray, Julie appeared to have a "seizure episode." She also testified that she left Julie unattended for a brief period of time and that she did not use the restraint straps which were attached to the portable x-ray chair. Using the restraint straps would have secured Julie to the portable chair during the x-ray examination. Taking the evidence in the light most favorable to Julie, the nonmoving party, we find substantial evidence existed to establish a breach of reasonable care by Mercy Hospital.

III. *Causal Nexus between Mercy's Conduct and Julie's Injury.* Mercy's next contention is that insufficient evidence was presented to establish a casual nexus between Mercy's conduct and Julie's injury.

Julie was not cognizant during the x-ray examination, the time during which the trauma was to have occurred. Therefore, Julie relied upon circumstantial evidence to establish the causal nexus between the events in the x-ray examination room and her injury. Direct and circumstantial evidence are equally probative. Iowa R.App.P. 14(f)(16).

■ Dr. Maletta, who performed the surgery, testified that there had been no problems with the septum in the surgery and that he had never had a complication such as Julie's injury occur during surgery. While Julie was in recovery immediately following the surgery, Dr. Maletta observed no injuries to Julie's nose. Julie did not leave her bed until she was taken to the x-ray room that next morning. Julie had a "syncopal episode" (similar to a seizure) while she was in the x-ray room. Following the x-ray examination, Julie's nose appeared "grotesque" and to be injured. Taking the evidence in the light most favorable to Julie, the nonmoving party, we find substantial evidence existed to establish a casual connection between Mercy's conduct and Julie's injury.

IV. *Damages.* Finally, Mercy contends that Julie's evidence was not sufficient to support the amount of damages awarded by the jury verdict. Mercy argues that the district court erred when it refused to grant its motions for a directed verdict and judgment notwithstanding the verdict.

We will not disturb jury verdicts pertaining to damages unless "they are flagrantly excessive or inadequate, so out of reason so as to shock the conscience, the result of passion or prejudice, or lacking in evidentiary support." *Harsha v. State Savings Bank,* 346 N.W.2d 791, 799 (Iowa 1984) (citations omitted).

■ The amount of damages awarded included an award of $370 for lost wages. Even though Julie received paid medical leave during the period she was forced to miss work, we agree that the time taken as sick leave is compensable. Julie should not be forced to use up her paid leaves before she receives any compensation for lost wages. Therefore, we find the award to be supported by the evidence and not to be excessive.

■ The jury also awarded $3000 for future pain. Julie testified that one nostril is still smaller than the other. In addition, she still has difficulty breathing and continues to suffer occasional pain. Therefore, we find the award to be supported by the evidence and not to be excessive.

The jury also awarded $10,000 for future loss of body function. Again, Julie testified that she continues to have difficulty breathing as she cannot draw an equal amount of air through each nostril. We find this award to be supported by the evidence and not to be excessive.

Finally, the jury awarded $15,000 for past pain and suffering and $20,000 for past lost function of her nose. The injury to Julie's nose required two separate operations. For each operation, Julie needed additional time and energy to recuperate and heal. Consequently, we find these awards also to be supported by the evidence and not to be excessive.

Taking the evidence in the light most favorable to Julie, the nonmoving party, we find substantial evidence existed to support the amount of damages awarded in the jury verdict.

The costs of this appeal are taxed to Mercy Hospital.

For all the reasons stated, the judgment of the district court is affirmed.

AFFIRMED.